UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

SHANNON GUTHRIE,                          )
                                          )
Plaintiff,                                )
                                          )
vs.                                       )     Case No. 3:23-cv-02989-GCS
                                          )
BOARD OF TRUSTEES FOR                     )
SOUTHERN ILLINIOIS UNIVERSTIY,            )
                                          )
Defendant.                                )
                                          )

**MEMORANDUM & ORDER**

**SISON, Magistrate Judge:**

### INTRODUCTION AND BACKGROUND

Before the Court is Defendant's motion for summary judgment (Doc. 74, 75, 76, 84, 85). Plaintiff opposes the motion. (Doc. 81). Based on the delineated reasons, the Court finds that genuine disputes of material facts exist that prevent summary judgment and denies the motion.

On December 14, 2023, Plaintiff Shannon Guthrie filed an amended complaint for gender discrimination against Defendant Board of Trustees for Southern Illinois University ("University") under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. (Doc. 44). Plaintiff alleges the University discriminated against her on the basis of sex when it failed to hire her as the head softball coach in 2021. Instead, the University hired P.J. Finigan, a male baseball assistant coach with no softball experience, who did not apply for the position and did not meet the posted minimum qualifications. Prior to filing suit, Plaintiff

Page 1 of 20

filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), and the EEOC issued Plaintiff's Notice of Right to Sue on June 6, 2023. (Doc. 44, p. 2). Defendant answered the amended complaint on December 21, 2023. (Doc. 46).

### FACTS

The following material facts are undisputed except where noted. All facts are taken in a light most favorable to Plaintiff. *See National American Ins. Co. v. Artisan and Truckers Cas. Co.*, 796 F.3d 717, 722-723 (7th Cir. 2015).

The University operates as a public university on its Edwardsville campus known as Southern Illinois University ("SIUE"). The Athletics Department at SIUE has several NCAA Division I sports programs, including softball and baseball programs. Both of these programs are led by a Head Coach, along with assistant coaches. Additionally, sports administrators provide oversight to head coaches on several issues, including student-athlete welfare, personnel issues, and compliance. Katherine Zingg was the sports administrator for the softball program from 2019 to 2022.

For nearly thirty years, Sandy Montgomery was the Head Softball coach at SIUE. After Montgomery retired in 2019, the University promoted a woman Assistant Softball coach to the Head Coach position ("Former Coach"). After the 2021 season, the University reassigned the Former Coach to Facilities and Event Manager, an administration position, thus creating the opening for the new Head Softball Coach.

In 2021, Tim Hall was the Athletic Director at SIUE. In this role, Hall was responsible for compliance, academics, budget, student-athlete welfare, fundraising, corporate

sponsorships, ticket sales, and community development. He was also responsible for hiring administrators and coaches in the SIUE Athletic Department.

As to the new Head Softball Coach position, Hall claimed he wanted to find a new coach who was calm, communicative, empathetic, patient, measured, and able to build positive relationships with student-athletes. Hall contended that he looked for someone who saw themselves as an educator and was committed to the comprehensive welfare of the student-athletes.

In 2021, the University formed an eight-member search committee to hire the softball coach. This committee consisted of four men and four women. The committee members were: 1) Katie Zingg (female), Associate Athletic Director for Compliance/SWA, who organized the search; 2) Jameson Adams (male), Associate Athletic Director for Internal Operations and Fan Engagement; 3) Dr. Venessa Brown (female), Associate Athletic Director for Diversity, Equity and Inclusion/Athletics Chief Diversity Officer; 4) Marcus Evans (male), Head Cross County and Track & Field Coach; 5) Danielle Liberatore (female), Assistant Softball Coach; 6) Sean Lyons (male), Head Baseball Coach; 7) Dr. William Retzlaff (male), Associate Dean of the College of Arts and Sciences and Faculty Athletics Representative; and 8) Dr. Lindsay Ross-Stewart (female), Associate Professor and Director of Mental Health Performance. Hall was the final decision-maker.

On or about May 17, 2021, SIUE posted the Head Softball Coach position. The minimum qualifications for the job were listed as: Bachelor's degree; four years of collegiate coaching; evidence of strong organizational and communication skills and current knowledge of NCAA Division I regulations; proven successful softball recruiting

experience at a collegiate level; evidence of a commitment to academic excellence including athlete graduation; ability to interact effectively with student-athletes, colleagues, and the public; capable of willing to actively plan and participate in fund-raising, promotions, and other similar endeavors as they relate to the softball program and the entire Athletics Department. The preferred qualifications were a master's degree and NCAA Division I coaching and recruiting experience. (Doc. 81-4).

Plaintiff submitted her application on May 26, 2021. In college, Plaintiff played Division I softball, earning All-American honors. She also played professionally in the National Pro Fastpitch League. Thereafter, she coached collegiate softball for more than 14 years, including seven years as a head coach. She led teams to postseason play and developed award-winning athletes. She has a master's degree in Sport Management.

Zingg, Ross-Stewart and Evans served as a "screening committee" by reviewing the initial set of thirty applicants and resumes to narrow the pool. On June 3, 2021, Zingg emailed the search committee members and advised that the screening committee narrowed the applicants to twelve candidates for the full committee to evaluate. Each search committee member completed written scoring rubrics for the remaining twelve candidates. Zingg ranked the candidates based on their score. On June 8, 2021, the search committee held a Zoom meeting to discuss the twelve applicants. That same day, Zingg emailed Hall the list of the candidates that the committee chose for the initial Zoom interviews. In response, Hall stated they should speak as he had some concerns about the candidates, to which Zingg replied admitting that "[t]he committee has some red flags about several, but was pretty adamant they wanted to still do first round interviews to

investigate some more." Zingg testified the "red flags" were not related to Plaintiff or Chelsey Mulligan, the other top female candidate. (Doc. 81-23, p. 13).

Thereafter, the committee went forward with the Zoom interviews, and Plaintiff was interviewed by Zingg and Evans. After her Zoom interview, Plaintiff emailed Head Baseball Coach Lyons on June 11, 2021, thanking him for his time. After the Zoom interviews, the search committee selected two candidates for on-campus interviews: Plaintiff and Chelsey Mulligan. At the time of the applications, Plaintiff was the Head Softball Coach at University of Illinois Springfield, a Division II softball program, and Mulligan was an Assistant Softball Coach at Saint Louis University, a Division I softball program.

Hall met both finalists during the on-campus interviews. Plaintiff's interview was on June 25, 2021. Plaintiff met with several others during her on-campus interviews, including search committee members, student-athletes, and coaches of other programs in the Athletics Department. After the interviews, Hall asserted Mulligan was not experienced enough to serve as head coach. Plaintiff was qualified to serve as head coach by her experience, but she was not the right fit for the program at the time. Hall maintained he had a "gut feeling" Plaintiff lacked the right soft skills for the team's culture and student-welfare needs.  Specifically, Hall testified:

> Q. What did you think of Shannon when you met with her?
> A. She was experienced, had been a head coach, but not the right fit for what I felt we needed at the time.
> Q. And how was she not a right fit?
> A. It goes back to what I said before about a gut feeling. You take the objective and then the subjective gut that I just felt wasn't the right fit at that right – at that particular time.

Q. So if I'm hearing you right – and please correct me if I am wrong – objectively she met the qualifications to be the head coach. Is that fair to say?
A. Yes.
Q. So there's nothing about her that made her unqualified for this position?
A. That is correct.
Q. So in regard to that gut feeling of it not being the right fit, can you point to something that says like this is why she was not the right fit?
A. I didn't get a sense of empathy, connectedness, vulnerability, what are many times classified as the soft skills.

(Doc. 86-1, p. 24, 25).

The search committee did not reach a consensus about the two finalists. There was some support for Plaintiff, and there was some support for Mulligan.

On June 28, 2021, Zingg emailed Hall and provided him feedback received from the student-athletes, search committee members, and staff regarding the finalists. Zingg's written feedback as to Plaintiff states:

Shannon – having several years as a head coach under her belt, she definitely has her program expectations and real experience to go from. She had great energy most of the day and I could se [sic] her being very effective in connecting with recruits. My biggest concern is that she will not have the positive culture we expect and will just be a similar version of what we are trying to get rid of. Several times she stopped her answer to a question about culture or SA experience and it seemed like it was because she knew what not to reveal in an interview. She asked me if we would meet regularly as admin-Head Coach and when I said yes, she seemed a little put off and said "I'm not really used to that." She does come from a very tumultuous administration at her current institution, though, so I take that into consideration.

. . .

In the end, while I have significant reservations about both, I think the larger learning curve for Chelsey is a reservation we can overcome.

(Doc. 81-22, p. 5).

Committee member Adams's feedback reads as follows:

- Successful track record as a head coach with regional recruiting ties
- Answers to questions regarding recruiting were broad and lacked detail.
- Gave answers that lead me to believe that she would want to micro manage every aspect of the program. We have seen how this approach works out.
- My gut tells me she would be a lot closer to our previous head coach given her answers and statements regarding how she would run the program and grow culture.
- Would she be successful as a head coach? Probably. Would she make a swift change in team culture in a positive manner? No
- Would I recommend her for the position?: No

*Id.* at p. 3, 4.

Committee member Evans's feedback provides:

Shannon is strong on X's and O's she seems like she needs an assistant strong on the organizational side. She is a competitor and a recruiter. I like she has weekly meetings and check-ins. She has a plan for the game I don't know if she has one for student athlete experience.

*Id.* at p. 4.

Retzlaff's input states in part:

I have concerns about both softball coaching candidates. If I had to make a choice to hire one of the two, I am not sure that I could do it. This search (and final choice) is just not as clear to me as previous searches I have helped the department of athletics with.

. . .

My experience with Coach Guthrie was quite different. She too chatted pleasantly, but seemed a bit reserved and wary. Following the meeting as I mentioned to you later I felt like I received answers to my questions that were rehearsed. I appreciate that her goal is to become a head coach at a D1 program, but I am also left wondering if she was "ready" to take on a "tough job" in assuming the role of the Head Softball Coach at SIUE.

Neither candidate really signaled to me that they could become the next "leader" if SIUE softball.  Sigh. . . .

*Id.* at p. 4.

Committee member Ross-Stewart's comment as to Plaintiff reads:

Strengths

She has a history of winning both as an Assistant Coach and as a Head Coach. I believe having Div I experience as an Assistant Coach in a conference a step above the OVC and having Division II experience in a strong conference serve her well for this position. She played and mentored under a coach with an excellent reputation within the field of softball, but she has clearly developed her own style that focused on player development, culture development and accountability. I think she demonstrated knowledge of the importance of building players up and developing a culture in which mistakes are part of learning, while still having a clear focus on accountability being a priority. I appreciated she understands that accountability isn't punishment and that punishment isn't a first resort in coaching. She understands the demands of being a HC in a competitive conference and has clear goals and expectations of where she would expect the program to go in the future.

Concerns

She was almost too casual in the search committee session. She didn't seem well prepared, as to the specifics of what she would need to do at SIUE. I was disappointed she didn't have a coaching packet, as she should be experienced enough to know that it is important to have something to give the committee to clearly outline who she is as a coach. I did worry at times that she relies too heavily on what works for her, opposed to being open to professional development and understanding the game outside her own viewpoint.

Overall

I would support her being offered the position. I believe she has a winning mentality and a good understanding of team development. I believe she has a confidence in herself that is necessary to be a good HC, however if hired, I would expect it would take her some time to figure out what level of

*Id*. at p. 2.


Committee member Liberatore assessment of Plaintiff states:

I took the weekend to think it over and my gut feeling and full confidence is with Shannon Guthrie for the Head Coach pick. I believe Shannon has the experience necessary to rebuild the fragile culture we have within our program. We had some really great conversations at lunch together and I have full confidence in her coaching philosophies. She knows how to run a full and competitive defensive practice, which is something we desperately need. I think her positive energy, vocality, and extensive knowledge of the game could benefit the program and be something the athletes could thrive under. She's got the head coaching experience and has proven that she can lead a team to success. She is

very collaborative and open minded. She seems to have more of a set plan to hit the ground running. She explained to me how she usually runs practices and how the staff comes up with drills and different ideas together ahead of time in a collaborative environment. I believe she could create a cohesive staff environment and a healthy culture throughout the program. I have only heard great things from the coaching side. I could see myself working for her AND with her. I feel the most confident with her capabilities as a head coach and supervisor.

. . .

With that being said, Shannon Guthrie is my pick to be the new Head Coach of the program and has my full support.

*Id.* at p. 5.

Lastly, Committee member Lyons's feedback as to Plaintiff states:

Impressions / take-aways

- Very personable and you could tell she has experience being a head coach
- Asked some very good questions about the position
- I do think her personality will help in recruiting
- Confident in her plan for SIUE and how Cougs could get to top of OVC

Concerns

- Ability to work well with other coaches (Facility sharing??)
- Is her personality similar to our previous head coach?

*Id.* at p. 6.

While the search for the head softball position was ongoing, Hall reached out to PJ Finigan, an assistant baseball coach at SIUE, on June 18, 2021. Finigan did not apply for the position of head softball coach, and his interview process was not like the other candidates' process. Finigan had no softball coaching or playing experience. As to his hiring process, Finigan testified as to the following:

Q. Just to try to narrow down that timeline a little bit, do you know, when you had that conversation with Mr. Hall, was this prior to the candidates coming for an interview?

A. I do not know. I don't recall that.

Q. About how long of a time between when Mr. Hall first approached you to you accepting the position – like what was the gap in between there?

A. A matter of days.

. . .

Q. And then when he – how did he broach the idea of you becoming the softball coach?

A. At the end of a yearly review conversation, after meeting with him for a long period of time regarding my position with baseball and just going over my anonymous survey from the players and things like that, he just asked me if I would have interest in becoming the interim softball coach because he thought I was exactly what that program needed as far as a person, mentor, and someone who could take over and show them a different experience.

(Doc. 76-4, p. 3, 5).

Hall testified as to the following regarding Finigan's hiring process:

Q. What process did PJ Finigan go through?

A. I asked him if he would consider an interim appointment after getting approval from the chancellor and the appropriate paperwork was done to be able to appoint him in that position, I believe, and then we moved forward.

Q. Did you have a conversation with the chancellor about hiring PJ for the job?

A. I did.

Q. When did you have that conversation?

A. I can't remember?

Q. Was it before or after Shannon's interview?

A. I can't remember. My guess it would be after.

Q. Just for clarity purposes, is it possible it was before?

A. I can't – I don't know.

Q. What did the chancellor say?

A. That he agreed with the thought process and the general process to date and approved moving forward.

Q. Okay. And what was the thought process?

A. That we make this interim appointment to allow some of the culture issues to rectify and then do another search.

(Doc. 86-1, p. 34, 35).  Hall testified he had a "gut feeling" about Finigan. *Id*. at p. 40. The

text messages between Hall and Finigan regarding the position took place from Friday, June 18, 2021, through Thursday July 1, 2021. (Doc. 81-39).[1]

Ultimately, Hall decided to "fail" the search, meaning that none of the applicants were hired. On July 1, 2021, Zingg called Plaintiff and informed her that none of the candidates were hired for the position. On July 1, 2021, at 6:45 PM, it was announced that Hall, "after an unsuccessful external search," appointed Finigan as "SIUE softball Interim Head Coach." (Doc. 81-11).

Thereafter, Plaintiff emailed SIUE after Defendant announced its decision to appoint Finigan. On July 7, 2021, SIUE responded to Plaintiff and wrote that the decision was determined by the coaching needs of the team at that time and was not a determination that Plaintiff was unqualified.

On June 14, 2022, Finigan resigned. Thus, SIUE formed another search committee to find a new head softball coach. The 2022 search committee narrowed the candidates down to two (2) finalists for on campus interviews: Kirsten Verdun, a woman, and Ben Sorden, a man. After the on-campus interviews for the 2022 search, SIUE offered the job

---

[1]     The first text from Hall to Finigan is on June 18, 2021, at 10:05 am and states: "This is Tim Hall. Hope you are well, brother. Can you confidentially pop down to my office around noon. All good. Just want to pick your brain. Thanks." On June 21, 2021, Finigan replied: "I apologize for the text but wanted to get back to you about our conversation Friday. Thank you for allowing me some time to think about it. I would like to sit down with you again to hear more about the opportunity and answer some questions. Just want to follow up confidentially. Thank you again and I look forward to talking." Hall eventually responded that same day: "Just go back," to which Finigan texted: "On my way." Thereafter, Hall reached out Finigan to speak to him four more times from June 29, 2021, to July 1, 2021. (Doc. 81-39).

to Verdun. However, Verdun declined the job offer and SIUE offered the position to Sorden, who accepted the job. Plaintiff did not apply for this position in 2022.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper when the pleadings and affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. PROC. 56(c); *Gupta v. Melloh*, 19 F.4th 990, 997 (7th Cir. 2021) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986)). The movant bears the burden of establishing the absence of a genuine issue as to any material fact and entitlement to judgment as a matter of law. *See Quinn v. Wexford Health Sources, Inc.*, 8 F.4th 557, 567 (7th Cir. 2021) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). This Court must consider the entire record, drawing reasonable inferences and resolving factual disputes in favor of the non-movant. *See Fletcher v. Doig,* 145 F.4th 756, 764 (7th Cir. 2025) (citing *Anderson*, 477 U.S. at 255). *See also Bishop v. Air Line Pilots Association International,* 5 F.4th 684, 693 (7th Cir. 2021) (stating that "we are not required to draw every conceivable inference from the record . . . but 'only those inferences that are reasonable.'") (internal citations omitted). Summary judgment is also appropriate if a plaintiff cannot make a showing of an essential element of his claim. *See Celotex*, 477 U.S. at 322. While the Court may not "weigh evidence or engage in factfinding[,]" it must determine if a genuine issue remains for trial. *Lewis v. City of Chicago*, 496 F.3d 645, 651 (7th Cir. 2007).

In response to a motion for summary judgment, the non-movant may not simply rest on the allegations in his pleadings; rather, he must show through specific evidence that an issue of fact remains on matters for which he bears the burden of proof at trial. *See Knight v.*

*Wiseman,* 590 F.3d 458, 463 (7th Cir. 2009); *Abrego v. Wilkie*, 907 F.3d 1004, 1012 (7th Cir.

2018). No issue remains for trial "unless there is sufficient evidence favoring the non-

moving party for a jury to return a verdict for that party . . . if the evidence is merely

colorable, or is not sufficiently probative, summary judgment may be granted." *Anderson*,

477 U.S. at 249–250 (citations omitted). *Accord Smith v. City of Janesville,* 40 F.4th 816, 821 (7th

Cir. 2022); *Doxtator v. O'Brien,* 39 F.4th 852, 860 (7th Cir. 2022). In other words, "inferences

relying on mere speculation or conjecture will not suffice." *DiPerna v. Chicago School of*

*Professional Psychology,* 893 F.3d 1001, 1006 (7th Cir. 2018) (internal citation omitted). *See also*

*Anderson*, 477 U.S. at 252 (finding that "[t]he mere existence of a scintilla of evidence in

support of the [non-movant's] position will be insufficient; there must be evidence on which

the jury could reasonably find for the [non-movant]"). Instead, the non-moving party must

present "definite, competent evidence to rebut the [summary judgment] motion." *Burton v.*

*Kohn L. Firm, S.C.*, 934 F.3d 572, 579 (7th Cir. 2019) (internal citation omitted).

　　　Finally, at the summary judgment stage it is not the Court's role to "sift through the

evidence, pondering the nuances and inconsistencies, and decide whom to believe." *D.Z. v.*

*Buell*, 796 F.3d 749, 756 (7th Cir. 2015) (citing *Waldridge v. American Hoechst Corp.*, 24 F.3d

918, 920 (7th Cir. 1994). *See also Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995)

(noting that courts are "not required to scour the party's various submissions to piece

together appropriate arguments."). Instead, the Court "is only tasked with deciding

whether, based on the evidence of the record, there is any material dispute of fact that

requires a trial." *Buell*, 796 F.3d at 756.

## DISCUSSION

Title VII makes it unlawful for an employer to "discriminate against any individual . . . because of such individual's . . . sex." 42 U.S.C. 2000e-2(a)(1). "[T]he singular question that matters in discrimination case" is "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Johnson v. Advocate Health & Hospitals Corporation*, 892 F.3d 887, 894 (7th Cir. 2018) (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764–766 (7th Cir. 2016)). "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself. . . . Relevant evidence must be considered and irrelevant evidence disregarded." *Id.*

Under Title VII, Plaintiffs have "two paths to survive summary judgment." *Gamble v. County of Cook*, 106 F.4th 622, 625 (7th Cir. 2024). One is by "generally present[ing] enough evidence from which a reasonable jury could find that [the University] discriminated against [Plaintiff] because of" Plaintiff's sex. *Id.* at 626. The other is through the well-known framework of *McDonnell Douglas. Id.* at 625–626; *see also Lesiv v. Illinois Central Railroad Comapny*, 39 F.4th 903, 911 n.3 (7th Cir. 2022). *McDonnell Douglas* requires a plaintiff to satisfy a prima facie showing that (1) she is a member of a protected group; (2) she applied for and was qualified for the position; (3) she was rejected for the position; and (4) the employer hired someone outside the protected group who was not better qualified than the plaintiff. *See Chatman v. Board of Education of City of Chicago*, 5 F.4th 738, 746 (7th Cir. 2021). In determining whether the evidence would permit a reasonable factfinder to conclude that Plaintiff's gender caused her to be treated unfairly,

"the burden-shifting framework of *McDonnell Douglas* remains relevant as a means of organizing, presenting, and assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases." *Owens v. Old Wisconsin Sausage Company, Inc.*, 870 F.3d 662, 667 (7th Cir. 2017) (quotation and citation omitted). The Court, however, "review[s] the evidence holistically to see if it permits an inference of race discrimination." *Lloyd v. Mayor of City of Peru*, No. 18-2410, 761 Fed. Appx. 608, 610 (7th Cir. Mar. 4, 2019). "[A]l evidence belongs in a single pile and must be evaluated as a whole." *Igasaki v. Illinois Department of Financial and Professional Regulation*, 988 F.3d 948, 957 (7th Cir. 2021) (citation and quotation omitted).

If the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. J*ohnson v. General Board of Pension & Health Benefits of United Methodist Church*, 733 F.3d 722, 728 (7th Cir. 2013). For a failure-to-hire claim, one example of a legitimate, nondiscriminatory reason a defendant may supply is that "the individuals ultimately hired were better candidates" than the plaintiff. *Skiba v. Illinois Central Railroad Company*, 884 F.3d 708, 724 (7th Cir. 2018); *see also Scruggs v. Garst Seed Co.*, 587 F.3d 832, 839–840 (7th Cir. 2009) (explaining that, when hiring for a research assistant position, an employer had a legitimate, nondiscriminatory reason to select someone with experience as a research assistant for the company).

If the employer offers a legitimate, nondiscriminatory reason, the burden then shifts back to the plaintiff to produce evidence that the defendant's reason is pretext for discrimination. *Johnson*, 733 F.3d at 728. In this context, pretext "means a lie, specifically a

phony reason for some action." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995). Additionally, the Seventh Circuit has referred to pretext as an employer's efforts to cover their tracks or hide the real reason for not hiring an applicant. *See Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1175 (7th Cir. 2002). However, "a showing of pretext alone is not enough; the plaintiff must also show that the explanations are a pretext for the prohibited animus." *Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 740 (7th Cir. 2013). Pretext is not established simply because the plaintiff denies the reasons for why she was not selected. The Seventh Circuit reiterated this notion when it stated the following:

> Shures contends on appeal that, because he denies all of the employer's findings concerning poor performance, a jury trial is required to resolve the dispute. This misunderstands what is necessary to establish pretext. Most fired employees believe that they have unrecognized or underappreciated talents. But it does not matter what the employee believes; the question is what the employer believes. To establish pretext, the plaintiff must show that the employer does not believe its own explanation – that it is lying rather than just making an error. *See, e.g.*, *Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 726 (7th Cir. 2008); *Bragg v. Munster Medical Research Foundation Inc.*, 58 F.4th 265, 271 (7th Cir. 2023).

*Shures v. Ameren Illinois Company*, No. 23-2761, 2024 WL 1756338, at *1 (7th Cir. April 24, 2024).

Defendant moves for summary judgment arguing that Plaintiff cannot establish a prima facie case of discrimination; that it had a legitimate non-discriminatory reason for its decision; and that Plaintiff cannot show pretext. Plaintiff counters that the hiring process was a sham; that Finigan was pre-selected before her interview took place; and that Defendant's stated reasons are inconsistent, subjective, and contradicted by the record. Based on the record, the Court agrees with Plaintiff.

First, there is no claim that Hall or any other person with authority to fill the head softball coach position stated that Plaintiff did not receive the position because she is female. As such, to succeed on her claim, Plaintiff must establish a prima facie case. Here, there is no question that Plaintiff is a member of a protected class. There is also no dispute that she applied for and was qualified for the position, and she was rejected for the position.[2] Instead, the parties dispute whether Plaintiff has offered sufficient evidence on the last element, *i.e.*, whether the University hired someone outside the protected class that was less qualified.

Defendant contends that Finigan was better qualified for the position based on the priority of a "culture change." However, the record contains evidence from which a reasonable jury could conclude Plaintiff was substantially more qualified than Finigan for this position. The job posting required collegiate softball coaching experience, the ability to recruit, knowledge of NCAA rules, and the ability to develop student-athletes. Plaintiff met these qualifications. In fact, she played softball most of her life and had 14 plus years of softball coaching experience, including head-coaching experience. She had a master's degree in sport management. Finigan had no softball coaching or playing experience. Further, Finigan did not apply for the position, he did not interview in the same process as the Plaintiff, and he did not have a master's degree. At the time he applied, Finigan was a baseball assistant coach for SIUE.

Regarding pretext and whether there exists a legitimate, non-discriminatory reason,

---

[2]     Defendant only addresses/disputes the last element of the prima facie claim.

Defendants assert Hall prioritized "culture change." Specifically, Hall testified he rejected Plaintiff based on a "gut feeling." He felt she lacked the "soft skills" necessary to repair team culture, and Finigan was selected as an interim stabilizer. This is a legitimate reason on its face.

The question then turns to whether there is any evidence in the record indicating that the proffered explanation was a pretext or "an attempt to mask a discriminatory reason with a legitimate excuse." *Crain v. McDonough*, 63 F.4th 585, 593 (7th Cir. 2023). "Pretext is not 'just faulty reasoning or mistaken judgment on the part of the employer; it is [a] lie, specifically a phony reason for some action.'" *Id.* (quoting *Burton v. Board of Regents of University of Wisconsin System*, 851 F.3d 690, 698 (7th Cir. 2017). Here, the Court finds that when read in the light most favorable to the Plaintiff, there is ample evidence in the record to support the existence of pretext.

First, the timing and context of Hall's communications and meetings with Finigan suggest preselection and, thus, pretext. In fact, Plaintiff contends Finigan accepted the job before the interviews. Defendant denies that Finigan was chosen before Plaintiff was interviewed. Defendant notes that the text messages do not show an offer was made, but rather that Hall and Finigan discussed an opportunity. The decision was also made after the interviews and committee feedback. However, both Plaintiff's and Defendant's interpretation is plausible. Thus, a factual dispute exists.

Second, the disparity in the qualifications between Plaintiff and Finigan can demonstrate pretext. A reasonable jury could conclude Plaintiff was vastly more qualified in every aspect. Finigan also lacked the minimum posted qualifications. Furthermore,

Page 18 of 20

Defendant's explanation that softball experience was irrelevant is contradicted by the University's job posting and historical hiring practices. Moreover, Finigan never applied for the job. The fact that Finigan was never interviewed for the position shows that Hall deviated from the University's normal hiring practices. Further, Hall's reliance on "gut feelings" and soft skills is subjective and clearly a question for the jury to decide. Additionally, Plaintiff testified that Hall arrived late for her interview, that he asked her a couple of generic questions at the beginning of the interview and then talked the entire time, that he made slights at the former female coach, that he was complimentary of male coaches, and that he displayed disinterest during the interview. (Doc. 81-14, p. 13-15). Defendant denies all these facts. Again, these credibility disputes cannot be resolved at the summary judgment stage.

Based on this record and when read in the light most favorable to the Plaintiff, a reasonable jury could find that Defendant's explanation for not hiring Plaintiff is in fact false, and it could readily infer that Defendant discriminated against Plaintiff because of her gender when it did not hire her for the head softball coach position. The Court, however, likewise finds that a reasonable jury could find the opposite. But, at this stage of the litigation, there is sufficient evidence in the record for the Plaintiff to survive summary judgment.

## CONCLUSION

For the above-stated reasons, the undersigned **DENIES** Defendant's motion for summary judgment. (Doc. 74). The Court **DIRECTS** the Clerk of the Court to set this matter for telephone status conference to discuss potential trial dates. Further, the parties shall

contact the undersigned's chambers if they feel a settlement conference would be beneficial.

**IT IS SO ORDERED.**

**DATED:  March 31, 2026.**

Gilbert C Sison

Digitally signed by Gilbert C Sison
Date: 2026.03.31 16:32:50 -05'00'

**GILBERT C. SISON**
**United States Magistrate Judge**